PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LUCIUS MAURICE ROWSER, | ) | |
| | ) | CASE NO.  5:12CV0610 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| STATE OF OHIO, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendants. | ) | **AND ORDER** |

*Pro se* Plaintiff Lucius Maurice Rowser is a state inmate currently incarcerated at Marion

Correctional Institution ("MCI").  He filed this civil rights action under 42 U.S.C. § 1983 against

the State of Ohio, Stark County Detective Erick Vandover, Canton Municipal Court Judge

Stephen F. Belden, Retired Stark County Court of Common Pleas Judge Charles E. Brown, Jr.,

Retired Geauga County Court of Common Pleas Judge H.F. Inderlied, Jr., the Ohio Fifth District

Court of Appeals, Richland Correctional Institution ("RiCI") Warden Margaret Bradshaw, MCI

Warden Jason Bunting, and Attorney Anthony Koukoutas.  In the Complaint (ECF No. 1),

Plaintiff alleges he was unfairly convicted of having weapons while under disability.  He seeks

monetary relief and release from prison.

## I.  Background

On May 29, 2009, Lora Matyas reported to the emergency room at Aultman Hospital

complaining of jaw pain from a bullet lodged in the lower cavity of her mouth.  *See State of Ohio*

*v. Rowser*, No. 2010CA00065, 2011 WL 441322, at *1 (Ohio App. 5th Dist. Feb. 7, 2011).  A

(5:12CV0610)

CAT scan revealed that the bullet had lodged in the muscle on the inside of her jaw and metal

fragments were lodged in her tongue.  *Id.*.  Ms. Matyas had surgery to remove the bullet.  *Id.*  The

emergency room physician also treated Ms. Matyas for a fracture of her shin bone, and noted

evidence of a fracture to her forearm that was at least three weeks old.  *Id.*  Ms. Matyas indicated

that Plaintiff shot her in the face,  hit her with a hammer, and poured hot grease on her.  *Id.*  Ms.

Matyas stated that she resided with Plaintiff; however, she was not free to leave the house.  She

claimed Plaintiff tied her up with a rope at night and would not allow her to exit the residence

without him.  She told Det. Vandover that she escaped from Plaintiff when he went to another

room to obtain drugs.  Ms. Matyas was discharged from the hospital thirteen days later.  *Id.*

Canton police obtained and executed a search warrant for Plaintiff's home on June 2,

2009.  *Id.*  The SWAT team arrived at the house at 5:00 p.m. to execute the warrant.  *Id.*  Plaintiff

was arrested and taken to the police station while the search was conducted.  *Id.*  During the

search, officers uncovered a .32 caliber revolver with one round of ammunition and a spent

casing, suggesting it had been fired.  *Id.*  Officers also found a hammer, which they swabbed for

DNA.  *Id.*  A firearms expert determined that the bullet retrieved from Ms. Matyas's jaw was

fired from the revolver.  *Id.*  Plaintiff was indicted by the Stark County Grand Jury on July 6,

2009 with one count of kidnaping, three counts of felonious assault and one count of having

2

(5:12CV0610)

weapons while under disability.[1]  *Id.*  One of the counts for felonious assault also included a

firearm specification.

The case proceeded to jury trial.  Plaintiff was acquitted of kidnaping and all counts of

felonious assault, but was convicted on the charge of weapons under disability.  He was

sentenced to five years incarceration.

Plaintiff filed this 98 page, single-spaced, hand-written Complaint, which is at times,

difficult to read and extremely redundant.  He claims Ms. Matyas lied to police about being

kidnaped and assaulted.  ECF No. 1 at 6.  He contends Ms. Matyas stated to police that she had

been kidnaped from April 1, 2009 to May 31, 2009 when in fact, she was admitted to the hospital

on May 29, 2009 and was still there on May 31, 2009.  ECF No. 1 at 6. He also asserts that

because she lived in the house with him, and did not leave the home, she could not have been

kidnaped.  ECF No. 1 at 6.  According to Plaintiff, Det. Vandover did not conduct a proper

investigation.  ECF No. 1 at 6.

Plaintiff also claims that the search conducted by the SWAT team was unlawful.  The

Canton Municipal Court docket indicates that a warrant was issued and executed on June 2,

---

[1]  Plaintiff was previously convicted on September 2, 1997 on charges of
kidnaping and felonious assault of his then girlfriend Jennifer Stamoules, with whom he
shared a residence.  Stamoules claimed Plaintiff became increasingly jealous, accusing
her of having affairs with co-workers and neighbors.  She testified that Plaintiff
barricaded the door to their apartment to prevent her from going out and kept a knife
beside his bed.  She indicated he taped her arms and legs together to keep her from
leaving.  She alleged that he struck her in the head with a metal skillet, burned her,
choked her, broke her nose, fractured three ribs, broke her foot and stabbed her in the
knee with the knife.  She escaped to the Alliance Women's Shelter on June 6, 1997.
Plaintiff was sentenced to five years in prison on these offenses.  *See State of Ohio v.
Rowser*, No. 1998CA00013, 1999WL 333296 (Ohio App. 5th Dist. May 24, 1999).

3

(5:12CV0610)

2009.  ECF No. 1 at 7.  Indeed, Plaintiff's Exhibit S to his Complaint is a photocopy of the

affidavit for search warrant which is signed by Judge Belden and file stamped on June 2, 2009.[2]

The docket also shows an affidavit for a search warrant that was filed and signed by the court on

June 3, 2009.  This affidavit was submitted by Det. Vandover to obtain a warrant to compel

Plaintiff to submit to an oral DNA swab.  A copy of this affidavit is also included in Plaintiff's

Exhibit S.  Another affidavit included in Exhibit S was submitted by Det. Vandover on June 3,

and filed on June 4, 2009.  This affidavit confirmed Plaintiff's location in the Stark County Jail

for the purpose of collecting the DNA swab.  Plaintiff appears to believe the second and third

affidavits for search warrants were to authorize the search of his house.  He claims that because

these affidavits were filed after the search of his home on June 2, 2009, the search of his home

was unlawful, and any evidence collected in that search, such as the gun, could not be used at his

trial.  ECF No. 1 at 6-7.  He asserts a violation of his Fourth Amendment rights.

Plaintiff also contends that Ms. Matyas signed a consent to search the residence on June

3, 2009.  ECF No. 1 at 6.  He asserts that the consent could not be used after the search to

provide proper authorization.  Exhibit B to the Complaint is a copy of that consent form which

gives police the authority to search her person for blood, body hairs, saliva, nail clippings, skin

scrapings or other bodily fluids.  It is not a consent to search the residence.

Plaintiff includes several random claims with regard to the search.  He claims that

because one of the charges of felonious assault carried a firearm specification, and because he

---

[2]  Plaintiff filed 61 multiple-page exhibits along with his Complaint.  Due to the
volume of pages, the Clerk's office did not scan the exhibits but rather made them
available for inspection in the Clerk's Office.

(5:12CV0610)

was not convicted of felonious assault, the jury did not believe he had a gun.  He claims the verdict removed the probable cause for the search warrant.  ECF No. 1 at 15.

Plaintiff contends that a statement in the search warrant characterizing him as armed and dangerous is inaccurate.  ECF No. 1 at 10.  He claims the gun was found in Ms. Matyas's room during the search.  ECF No. 1 at 50.  Plaintiff asserts it was not found in the room in which he was arrested, and was not in his possession.  He concludes therefore he was not armed and could not be convicted of having weapons under disability.  ECF No. 1 at 50.  According to Plaintiff, Judge Belden placed a "hit" on him by including that statement in the search warrant.  ECF No. 1 at 27.

Plaintiff asserts the warrant was invalid because it instructed officers to search the residence for evidence pertaining to the crimes of kidnaping, felonious assault, and having weapons under disability.  He claims he was never convicted of a weapons-related crime and therefore he did not have a weapon under disability.  ECF No. 1 at 48.  Plaintiff asserts that this statement makes the warrant invalid.  ECF No. 1 at 50.

Plaintiff also contends that the use of the SWAT team in general was an excessive use of force.  He alleges they damaged his property.  Plaintiff seeks a new aluminum screen door, with windows and locks, a new door for the house, a brand new living room set including a couch, love seat, and chairs, a 27-inch color television, a glass dining room set, a new upright refrigerator and freezer, an air conditioner for the lower level of the house, all new kitchen appliances, two lawn mowers, shelves, rakes, a leaf blower, "weed-eaters", spades and hand-held

5

(5:12CV0610)

yard tools, a large washer and dryer, three complete bedroom sets with three televisions, and a

new wardrobe that includes casual, sport, and dress clothing.  ECF No. 1 at 22.

Plaintiff includes multiple claims against Det. Vandover.  He asserts that Det. Vandover

altered the court's docket and tampered with records to change the date of the search warrant.

ECF No. 1 at 9.  Plaintiff contends that Det. Vandover did not look for other potential suspects.

ECF No. 1 at 8.  He asserts claims of county corruption, denial of due process, miscarriage of

justice, cruel and unusual punishment, conspiracy, dereliction of duty, malfeasance, malice,

obstruction of justice, neglect, negligence and racial discrimination.

In addition, Plaintiff claims that Judge Belden, Judge Brown and Judge Inderlied did not

make appropriate rulings in his case.  He alleges that neither Det. Vandover nor Ms. Matyas

appeared for his arraignment.  ECF No. 1 at 24.  He asserts that Judge Belden did not require

them to be present and this denied him the right to confront witnesses and face his accusers.

ECF No. 1 at 24.  Plaintiff claims in general that the judge was biased and violated the law.  He

contends Judge Belden set bail at an excessive level and falsified a search warrant to change the

date to June 2nd.  ECF No. 1 at 25-26.  He believes it is falsified because an affidavit for a search

warrant was filed on June 3.  ECF No. 1 at 26.  He claims he was subjected to a sham legal

process.

Judge Brown was assigned to Plaintiff's case when it was bound over to the Court of

Common Pleas.  Plaintiff claims Judge Brown made several incorrect rulings in his case.  He

contends he asked for new counsel to be appointed and the judge denied his request.  ECF No. 1

at 29.  He states he filed a grievance against the judge with the Stark County Bar Association.

(5:12CV0610)

ECF No. 1 at 30.  Plaintiff claims the judge should have dismissed the charges against him, but instead denied his motion to dismiss.  ECF No. 1 at 30-33.  He states the judge denied him the right to a speedy trial because he wanted to have Plaintiff undergo a mental health examination. ECF No. 1 at 34.  He claims he was denied due process and equal protection.

The case was transferred to Judge Inderlied on February 17, 2010.  ECF No. 1 at 35. Plaintiff contends Judge Brown attended the trial as a spectator and gave signals to Judge Inderlied.  ECF No. 1 at 35.  He claims Judge Inderlied did not find the search warrant to be invalid.  ECF No. 1 at 40, 41.  He states that Det. Vandover and Ms. Matyas were not present at his preliminary hearing and Judge Inderlied therefore also denied him the right to face his accusers.  ECF No. 1 at 17.  He alleges the judge admonished him five times during his testimony.  ECF No. 1 at 48.  He asserts claims against Judge Inderlied for dereliction of duty, criminal malfeasance, obstruction of justice, fraud, neglect, maliciousness, gross negligence, conspiracy, discrimination, sham legal process, and racial discrimination.

Plaintiff's claims against the Ohio Fifth District Court of Appeals and non-party Ohio Supreme Court are similar.  He alleges these courts engaged in racial discrimination by failing to find prosecutorial misconduct in his conviction.  ECF No. 1 at 60, 64.  He contends his appeal was initially dismissed because his attorney, Anthony Koukoutas, failed to file the proper documents.  ECF No. 1 at 60-61.  Plaintiff then alleges the state reopened his appeal under the same case number which he contends subjects him to double jeopardy.  ECF No. 1 at 61.  He claims Attorney Koukoutas refused to raise over 20 assignments of error Plaintiff wanted to assert.  ECF No. 1 at 63.  He contends Attorney Koukoutas is guilty of violating the Ohio Code

(5:12CV0610)

of Professional Responsibility.  Plaintiff alleges the Ohio Supreme Court returned a document

unfiled and dismissed motions without explanation.  ECF No. 1 at 82.  He contends this denied

him access to the courts.

Finally, Plaintiff brings claims against the wardens of RiCI and MCI.  He contends the

staff at RiCI hoped he would be attacked by gangs and then they would use the medical

department at the prison to kill him.  ECF No. 1 at 86.  He claims the medical department told

him his blood pressure was dangerously high.  ECF No. 1 at 87.  Plaintiff does not believe the

diagnosis is correct and claims he is in good physical condition.  ECF No. 1 at 93.  He indicates

the physicians wanted to prescribe blood pressure medication for him, but he refused the

treatment.  ECF No. 1 at 93-94.  The physicians tried to prescribe psychotropic medications, but

he refused those as well.  ECF No. 1 at 92.  Plaintiff asserts claims under the Eighth Amendment.

Plaintiff was transferred to MCI on September 21, 2011.  He contends the staff at MCI

opened mail he received from the Department of Justice.  ECF No. 1 at 91.  He claims they

violated his right to receive legal mail.  Plaintiff claims the physicians at this institution also

wanted to prescribe blood pressure medication for him.  ECF No. 1 at 93-94.  He once again

refused to accept the prescription.  ECF No. 1 at 93-94.  He also contends the prison engaged in

racial discrimination.  Plaintiff indicates he had a bottom bunk restriction that expired in May

2012.  ECF No. 1 at 95.  He alleges the prison staff refused to give him a bottom bunk or move

his bed assignment so that he could have his television in his cell.  ECF No. 1 at 95.  According

to Plaintiff, he has to keep his television in the property vault until he has a bottom bunk.  ECF

No. 1 at 95.

(5:12CV0610)

## II.  Standard for Dismissal

Although *pro se* pleadings are liberally construed, *Boag v. MacDougall*, 454 U.S. 364, 365 (1982) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the district court is required to dismiss an *in forma pauperis* action under 28 U.S.C. § 1915(e) if it fails to state a claim upon which relief can be granted or if it lacks an arguable basis in law or fact.[3]  *Neitzke v. Williams*, 490 U.S. 319 (1989); *Lawler v. Marshall*, 898 F.2d 1196 (6th Cir. 1990); *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996).  A claim lacks an arguable basis in law or fact when it is premised on an indisputably meritless legal theory or when the factual contentions are clearly baseless.  *Neitzke*, 490 U.S. at 327.  A cause of action fails to state a claim upon which relief may be granted when it lacks "plausibility in th[e] complaint."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007).  A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Ashcroft v. Iqbal* , 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  The factual allegations in the pleading must be sufficient to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true.  *Twombly*, 550 U.S. at 555.  Plaintiff is not required to include detailed factual allegations, but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading that offers

---

[3]  A claim may be dismissed *sua sponte*, without prior notice to the plaintiff and without service of process on the defendant, if the court explicitly states that it is invoking section 1915(e) [formerly 28 U.S.C. § 1915(d)] and is dismissing the claim for one of the reasons set forth in the statute.  *McGore v. Wrigglesworth*, 114 F.3d 601, 608-09 (6th Cir. 1997) (overruled on other grounds by *Jones v. Bock*, 549 U.S. 199 (2007); *Harris v. Johnson*, 784 F.2d 222, 224 (6th Cir. 1986); *Brooks v. Seiter*, 779 F.2d 1177, 1179 (6th Cir. 1985).

9

(5:12CV0610)

legal conclusions or a simple recitation of the elements of a cause of action will not meet this

pleading standard.  *Id.*  In reviewing a complaint, the Court must construe the pleading in the

light most favorable to the plaintiff and accept all allegations as true.  *See Harbin–Bey v. Rutter,*

*420 F.3d 571, 575 (6th Cir. 2005)*.

### III.  Law and Analysis

#### A.  Challenges to Conviction

As an initial matter, most of Plaintiff's claims directly attack his conviction for having

weapons while under disability.  A prisoner may not raise claims in a civil rights action if a

judgment on the merits of those claims would affect the validity of his conviction or sentence,

unless the conviction or sentence has been set aside.  *See Edwards v. Balisok*, 520 U.S. 641, 646

(1997); *Heck v. Humphrey*, 512 U.S. 477, 486 (1994).  The holding in *Heck* applies whether

Plaintiff seeks injunctive, declaratory or monetary relief.  *Wilson v. Kinkela*, No. 97-4035, 1998

WL 246401, at *1 (6th Cir. May 5, 1998).  The first step in this inquiry is therefore to examine

each claim to determine if it will imply the invalidity of Plaintiff's conviction or sentence.

#### 1.  Warrantless Search of Residence

First, Plaintiff alleges Canton police searched his residence prior to obtaining a warrant or

Ms. Matyas's consent.  He relies on the Canton Municipal Court docket to assert that his house

was searched on June 2, 2009 while affidavits for the search were filed on June 3, 2009.  He

contends that this proves there was no warrant to search his house on June 2nd.  ECF No. 1 at 7.

This claim is factually inaccurate.  The Canton Municipal Court docket indicates that a

warrant was issued on June 2, 2009.  *See* docket for Case No. 2009CRA02603 at

10

(5:12CV0610)

https://www.starkcountycjis.org/cjis2/docket/main.html and Exhibit A to the Complaint.

Moreover, Plaintiff's Exhibit S to his Complaint contains a photocopy of the affidavit for search

warrant which is signed by Judge Belden and file stamped on June 2, 2009.  The docket for Case

No. 2009CRA02603 also shows an affidavit for a search warrant was filed and signed by the

court on June 3, 2009.  This document, which is included in Plaintiff's Exhibit S, proves to be an

affidavit submitted by Det. Vandover to obtain a warrant to compel Plaintiff to submit to an oral

DNA swab.  Exhibit S further includes an affidavit submitted by Det. Vandover on June 3, and

filed on June 4, 2009, which confirmed Plaintiff's location in the Stark County Jail for the

purpose of collecting the DNA swab.  Neither of these affidavits pertain to the search of

Plaintiff's house.  The affidavit and the warrant for the search of the house were signed and filed

on June 2, 2009, prior to the search of the residence.

Similarly, Plaintiff contends that Ms. Matyas's consent to search the residence was signed

on June 3, 2009 and could not be used retroactively to authorize the search of the residence on

June 2, 2009.  ECF No. 1 at 6.  Exhibit B to the Complaint is a copy of that consent form in

which Ms. Matyas gave police the authority to search her person for blood, body hairs, saliva,

nail clippings, skin scrapings or other bodily fluids.  It was not a consent to search the residence

as Plaintiff assumes.

Moreover, even if this claim were factually supported, it challenges the validity of

Plaintiff's conviction on the charge of weapons under disability.  If the search were deemed to be

invalid, any evidence obtained from the search arguably would be excluded.  The weapon in

question was found during the search.  If the gun were excluded from evidence, it would clearly

11

(5:12CV0610)

call into question his conviction on the weapons charge.  To prevail on this claim, therefore,

Plaintiff would have to also allege that his conviction on the charge of having weapons while

under disability was overturned on appeal or in a habeas corpus proceeding.  *Heck*, 512 U.S. at

486.  To the contrary, his conviction was upheld on appeal, and there is no indication in the

record that a habeas corpus proceeding reversed his conviction.  *See State of Ohio v. Rowser*, No.

2010CA00065, 2011 WL 441322 (Ohio App. 5th Dist. Feb. 7, 2011).  Plaintiff cannot assert this

claim in this civil rights action.

### 2.  Inaccurate Statements in Warrant Affidavit

Plaintiff's next claim contests the accuracy of several statements in the affidavit

supporting the warrant.  He contends he was not armed and did not possess a weapon as alleged

in the affidavit.  He suggests that the officers could not seek evidence of having weapons while

under disability because he had never been convicted on a weapons-related offense.  He claims

these inaccuracies render the warrant invalid, and the search a violation of his Fourth

Amendment rights.

The Fourth Amendment provides that ". . . no Warrants shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and

the persons or things to be seized."  U.S. Const. amend. IV.  For a warrant to be valid, it must

describe the place to be searched with sufficient particularity to enable the executing officers to

locate and identify the premises with reasonable effort; and must be supported by probable cause.

*Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005).  The objections Plaintiff raises to the

warrant did not weaken the probable cause to support the warrant nor do they render the

(5:12CV0610)

description of the places to be searched vague. In essence, Plaintiff is disputing the meaning of the words "armed" and "having a weapon" contending that at the time of his arrest, the weapon was in another room. Even if Plaintiff's definitions of these words and phrases were correct, at best, his assertions would be minor technical defects in the warrant. Minor technical inaccuracies, will not render the search warrant unconstitutional. *Id.* at 568-69.

If the statements in the warrant, however, were deemed to be so inaccurate that they rendered the warrant invalid, the claim would call into question the validity of his conviction for weapons under disability. As stated above, Plaintiff cannot raise these claims in a civil rights action unless his conviction was overturned. *Heck*, 512 U.S. at 486.

### 3. Probable Cause Removed by Acquittal

In addition, Plaintiff claims that because he was not convicted of felonious assault with a firearm specification, the jury did not believe he had a gun, and the verdict therefore removed the probable cause for the search warrant. ECF No. 1 at 15. This assertion fails to state a claim upon which relief may be granted, and would call into question Plaintiff's conviction.

The existence of probable cause is an absolute bar to a § 1983 claim arising out of a search, seizure, detention or prosecution regardless of the lack of good faith or malicious motives on the part of the law enforcement officers. *See Logsdon v. Hains*, 492 F.3d 334, 340-41 (6th Cir. 2007). Subsequent acquittal, however, does not establish that the defendants lacked probable cause to arrest, search, detain and prosecute. *See Kompare v. Stein*, 801 F.2d 883, 891 (7th Cir. 1986). The state's failure to prove guilt beyond a reasonable doubt does not mean that it did not meet the lesser probable cause standard which requires only a reasonable belief that an

(5:12CV0610)

offense has been committed and that the criminal defendant committed the crime. *See Logsdon, 492 F.3d at 340-41; Williams v. Kobel, 789 F.2d 463, 470 (7th Cir. 1986)*. Conversely, the fact of conviction itself establishes probable cause for the arrest, as the higher standard needed to prove guilt has been met. *Schlueter v. Southern Energy Homes, Inc., 252 Fed.Appx. 7, 10 (6th Cir. 2007)*. Here, although Plaintiff was acquitted on the charge of felonious assault with a firearm specification, he was convicted of having weapons while under disability. His conviction on the weapon charge supported a finding a probable cause for his arrest on this charge.

Furthermore, a claim of lack of probable cause to support a conviction necessarily calls the conviction into question. Plaintiff therefore cannot proceed with this claim unless his conviction for weapons under disability is reversed or overturned. Because his conviction was upheld, this claim is also dismissed. *Heck, 512 U.S. at 486*.

### 4. Judicial Rulings and Decisions

Finally, Plaintiff asserts a number of claims against Judge Belden, Judge Brown, Judge Inderlied, the Ohio Fifth District Court of Appeals and the Ohio Supreme Court. All of these claims are based on Plaintiff's disagreement with decisions the Judges made in the course of presiding over Plaintiff's criminal prosecution, including their decision to allow the prosecution to continue, finding the search warrant to be valid, the denial of new counsel, and denial of his speedy trial motion. Although none of these claims is particularly well defined or supported, all would appear to call into question the validity of Plaintiff's conviction. He therefore cannot assert them in this civil rights action unless his conviction is overturned. *Id.*

### B. **Immunity**

14

(5:12CV0610)

In addition, five of the nine Defendants are absolutely immune from damages in a civil rights action. Judge Stephen F. Belden, Retired Judge Charles E. Brown, Jr., and Retired Judge H.F. Inderlied, Jr. are granted absolute judicial immunity. The State of Ohio and the Ohio Fifth District Court of Appeals are entitled to immunity under the Eleventh Amendment to the United States Constitution.[4]

**1. Judicial Immunity**

Judge Belden, Judge Brown, and Judge Inderlied are absolutely immune from damages for claims asserted against them for actions they performed as judges. Judicial officers are generally absolutely immune from civil suits for money damages. *Mireles v. Waco*, 502 U.S. 9, 9 (1991); *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997). This far-reaching protection is needed to ensure that the independent and impartial exercise of judgment is not impaired by the exposure of potential damages. *Barnes*, 105 F.3d at 1115. For this reason, absolute immunity is overcome only in two situations: (1) when the conduct alleged is not performed in the judge's judicial capacity; or (2) when the conduct alleged, although judicial in nature, is taken in complete absence of all jurisdiction. *Mireles*, 502 U.S. at 11-12; *Barnes*, 105 F.3d at 1116. Plaintiff alleges no facts to show that either of these criteria has been met in the case at bar.

The determination of whether an action is performed in the defendant's judicial capacity depends on the "nature" and "function" of the act, not on the act itself. *Mireles*, 502 U.S. at 13; *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). Looking first to the "nature" of the act, the Court

_____

[4] Non-party Ohio Supreme Court is the highest court in the judicial branch of government in Ohio which is organized pursuant to the Ohio Constitution, Art. IV, § 2. It would also be entitled to immunity under the Eleventh Amendment.

(5:12CV0610)

must determine whether it is a function generally performed by a judge.  *Stump*, 435 U.S. at 362.

This inquiry does not involve a rigid scrutiny of the particular act in question, but rather requires

only an overall examination of the judge's alleged conduct in relation to general functions

normally performed by judges.  *Mireles*, 502 U.S. at  13.  Second, an examination of the

"function" of the act alleged requires the court to assess whether the parties dealt with the judge

in her judicial capacity.

Upon applying these principles, it is evident on the face of the pleading that Judge

Belden, Judge Brown, and Judge Inderlied were acting in their judicial capacity at all times they

engaged in the conduct alleged in the Complaint (ECF No. 1).  Plaintiff did not interact with

them in any context outside of the courtroom or in any capacity other than their respective

judicial capacities.  Plaintiff cannot overcome the broad application of judicial immunity under

this criteria.

Judicial immunity can also be defeated when the conduct alleged, although judicial in

nature, is taken in complete absence of all jurisdiction.  *Mireles*, 502 U.S. at 11-12; *Barnes*, 105

F.3d at 1116.  When the immunity of the judge is at issue, the scope of the judge's jurisdiction is

to be broadly construed.  *Stump*, 435 U.S. at 356-57.  A judge will be not deprived of immunity

because the action she took was performed in error, done maliciously, or was  in excess of her

authority.  *Id.*  Actions taken in complete absence of all jurisdiction are those acts which are

clearly outside of the subject matter jurisdiction of the court over which the judge presides.  *King

v. Love*, 766 F.2d 962, 965 (6th Cir. 1985).  Conversely, merely acting in excess of authority does

not preclude immunity.  *See* *Sevier v. Turner*, 742 F.2d 262, 271 (6th Cir. 1984).

16

(5:12CV0610)

In the present case, Plaintiff objects to decisions these judges made in the course of the criminal proceedings against him.  Decisions concerning the validity of search warrants, assuring speedy trial rights are not denied, setting bail, and appointing counsel are all actions normally performed by judges in criminal matters.  Judge Belden, Judge Brown, and Judge Inderlied are absolutely immune from damages in this action.

### 2.  Eleventh Amendment

The States and the Federal Government possess certain immunities from suit in state and federal courts.  *Alden v. Maine*, 527 U.S. 706, 713 (1999).  For the Federal Government, that immunity does not come from any one provision in the Constitution but "is derived by implication" from the nature of sovereignty itself.  *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388 (1939).  For the States, immunity comes from the nature of sovereignty itself as well as from the Eleventh Amendment to the United States Constitution.  *Alden*, 527 U.S. at 713.  The States' immunity from suits in federal court applies to claims against a State by citizens of the same State as well as to claims against a State by citizens of another State.  *See id. at 728*; *Barton v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002).  Immunity also applies to actions against State officials sued in their official capacity for money damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613, 616, 623 (2002).

There are several exceptions to a States' federal-court immunity.  A State may waive that immunity through legislation, *see Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305-09 (1990), or through its conduct in litigation, *see, e.g.*, *Lapides*, 535 U.S. at 616.  The immunity does not attach if the lawsuit is not against the State or an "arm of the State."  *Mt.*

17

(5:12CV0610)

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *see Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).  Immunity "does not extend to counties and similar municipal corporations." *Mt. Healthy*, 429 U.S. at 280.  Immunity also does not apply if the lawsuit is filed against a state official for purely prospective injunctive relief enjoining the official from violating federal law.  *See Ex Parte Young*, 209 U.S. 123, 155-56 (1908).  Immunity may be abrogated by Congress when exercising its enforcement authority under the Fourteenth Amendment, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80 (2000), and perhaps other enforcement clauses, such as the Fifteenth Amendment, *City of Rome v. United States*, 446 U.S. 156, 178-80 (1980).  Immunity does not apply when the Federal Government brings the lawsuit.  *See United States v. Mississippi*, 380 U.S. 128, 140-41 (1965).  Finally, immunity does not apply when another State brings the lawsuit on behalf of its own interests rather than those of specific citizens.  *See Colorado v. New Mexico*, 459 U.S. 176, 182 n. 9 (1982).  Whether immunity exists in a given case is a question of constitutional law.  *S.J. v. Hamilton County*, 374 F.3d 416, 418 (6th Cir. 2004).

The State of Ohio and the Ohio Fifth District Court of Appeals are entitled to Eleventh Amendment immunity.  None of the exceptions listed above apply.  Ohio is clearly a state and immunity attaches from the nature of sovereignty itself as well as from the Eleventh Amendment.  *Alden*, 527 U.S. at 713.  The organization and jurisdiction of the Ohio Appellate Courts is contained in the Ohio Constitution, Art. IV, § 3, which describes them as arms of the state judicial branch.  A judgment against the Courts would be a judgment against the State of Ohio.

(5:12CV0610)

*Metz v. Supreme Court of Ohio*, 46 Fed.Appx. 228, 236-37 (6th Cir. 2002). The State of Ohio and the Ohio Fifth District Court of Appeals are entitled to absolute immunity.

## C. **Private Party Defendant**

Although not immune from damages, private attorney Anthony Koukoutas is not subject to suit in a § 1983 action. To establish a prima facie case under 42 U.S.C. § 1983, Plaintiff must assert that a person acting under color of state law deprived him of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). Generally to be considered to have acted "under color of state law," the person must be a state or local government official or employee.

Under very limited circumstances, a private party may be considered to be a "state actor." The Supreme Court has established four tests for determining whether the challenged conduct may be fairly attributable to the state for purposes of a § 1983 claim. These are: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test. *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 298 (2001); *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). The public function test requires that the private entity exercise powers that are traditionally exclusively reserved to the state, such as holding elections, *Flagg Bros. v. Brooks*, 436 U.S. 149, 157 (1978), or exercising the power of eminent domain. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 353 (1974). The state compulsion test requires that a State has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). More than mere approval or

19

(5:12CV0610)

acquiescence in the initiatives of the private party is necessary to hold the state liable for those

actions.  *Id.*  Under the symbiotic relationship or nexus test, the action of a private party

constitutes state action when there is a sufficiently close nexus between the state and the

challenged action of the regulated entity so that the action of the latter may be fairly treated as

that of the state itself.  *See Jackson*, 419 U.S. at 357-58; *Burton v. Wilmington Parking Auth.*,

365 U.S. 715, 724-25 (1961).  The entwinement test requires that the private entity be "entwined

with governmental policies" or that the government be "entwined in [the private entity's]

management or control."  *Brentwood*, 531 U.S. at 296.  The crucial inquiry under the

entwinement test is whether the "nominally private character" of the private entity "is overborne

by the pervasive entwinement of public institutions and public officials in its composition and

workings [such that] there is no substantial reason to claim unfairness in applying constitutional

standards to it."  *Id.* at 298.

Public defenders and privately retained defense attorneys are not "state actors" if the

claim against them is based solely on the fact that they participated in the litigation process.  *See*

*Polk County v. Dodson*, 454 U.S. 312, 318 (1981); *Flagg Bros.*, 436 U.S. at 155-57; *Catz v.*

*Chalker*, 142 F.3d 279, 289 (6th Cir.1998).  Merely being a participant in litigation does not

make a private party a co-conspirator or joint actor with the state.  *Dennis v. Sparks*, 449 U.S. 24,

28 (1980). Plaintiff alleges only that Attorney Koukoutas failed to file the proper documents to

perfect his appeal and refused to assert assignments of error Plaintiff thought meritorious.  These

actions are not sufficient to establish Koukoutas as a state actor.

**D.  Statute of Limitations**

20

(5:12CV0610)

Plaintiff includes other miscellaneous claims against Det. Vandover. He claims Det. Vandover failed to look for other suspects and acted with racially discriminatory motives in conducting his investigation. While most of these claims call Plaintiff's conviction into question, they also are time barred.

Ohio's two-year statute of limitations for bodily injury applies to § 1983 claims. *LRL Properties v. Portage Metro Housing Authority*, 55 F. 3d 1097 (6th Cir. 1995). Plaintiff has two types of claims with respect to Det. Vandover. First, he contests Det. Vandover's search of his house and Plaintiff's arrest. This occurred on June 2, 2009. Plaintiff also contests Det. Vandover's failure to investigate other suspects and obtain hospital records. These events took place in 2009. This action, however, was filed on March 12, 2012—well beyond the expiration of the two-year statute of limitations period. There would be no purpose in allowing this matter to go forward in view of the fact that it is clearly time-barred. *See Fraley v. Ohio Gallia County*, No. 97-3564, 1998 WL 789385, at *1 (6th Cir. Oct. 30, 1998) (affirming *sua sponte* dismissal of *pro se* § 1983 action filed after two-year statute of limitations for bringing such an action had expired).

**E. Racial Discrimination**

Plaintiff includes generalized allegations of racial discrimination against all of the defendants. He appears to suggest that he was targeted for prosecution because he is African American and Ms. Matyas is Caucasian. The conscious exercise of some selectivity in the enforcement or prosecution of a law is not in itself a federal constitutional violation if the selection is not deliberately based upon an unjustifiable standard, such as race, religion, gender,

21

(5:12CV0610)

or national origin. *Oyler v. Boyles*, 368 U.S. 448, 456 (1962). In order for Plaintiff to state a

claim for relief, he must show that he is a member of an identifiable racial group or a group

exercising constitutional rights and that other persons outside of that category were not

prosecuted in similar situations. *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997).

Plaintiff must also show that the prosecution had a discriminatory effect on the group to which he

belongs. *Id.*

The Complaint (ECF No. 1) does not state a claim for relief based on selective

prosecution. Plaintiff does not allege with any specificity that non-African Americans were not

prosecuted in similar situations. All of his claims for racial discrimination are stated as legal

conclusions. To satisfy basic pleading requirements, Fed. R. Civ. P. 8 requires a plaintiff to offer

more than just legal conclusions or a simple recitation of the elements of a cause of action.

*Iqbal*, 556 U.S. at 678. Plaintiff must include factual allegations that suggest more than a sheer

possibility that a defendant has acted unlawfully. *Id.* Where, as here, a complaint pleads only

legal conclusions or offers facts that are "merely consistent with" a defendant's liability, it fails

to meet the pleading standard. Plaintiff includes many pages of conclusory statements, but he

does not offer any factual allegations suggesting that any of the defendants singled him out for

prosecution due to his race. These claims are dismissed.

## F. **Property Damage**

Next, Plaintiff contends the SWAT team damaged some of his personal property during

the search. He includes an extensive list of demands for new household goods, furnishings,

appliances, electronics, and clothing. Although Plaintiff does not specify a legal claim that stems

22

(5:12CV0610)

from these allegations, the Court liberally construes this claim as arising under the Fourteenth Amendment for deprivation of property without due process.

There is no indication in the Complaint (ECF No. 1) that any of the defendants was a member of the SWAT team that allegedly caused damage to Plaintiff's property. Plaintiff cannot establish the liability of any Defendant absent a clear showing that the defendant was personally involved in the activities which form the basis of the alleged unconstitutional behavior. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976); *Mullins v. Hainesworth*, No. 95-3186, 1995 WL 559381 (6th Cir. Sept. 20, 1995). While Plaintiff objects in general terms to the use of the SWAT team, Plaintiff cannot hold any of Defendants liable for the damage to his belongings.

Furthermore, Plaintiff has not stated a claim for deprivation of property without due process. To assert a procedural due process claim, Plaintiff must plead and prove either that he was deprived of a constitutionally protected property interest as a result of an established state procedure that itself violates due process rights; or that Defendants deprived him of a protected property interest pursuant to a random and unauthorized act and available state remedies would not be adequate to redress the deprivation. *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir 1991); *see Vicory v. Walton*, 721 F.2d 1062, 1064 (6th Cir. 1983). Plaintiff does not appear to be challenging an established state procedure, statute or local ordinance. Instead, he is asserting he was deprived of personal property due to unauthorized acts of Defendants.

To state a procedural due process claim based upon alleged unauthorized acts of the defendants, Plaintiff must also plead and prove that state remedies for redressing the wrong are inadequate. *Macene*, 951 F.2d at 706; *Vicory*, 721 F.2d at 1064. A remedy for personal property

23

(5:12CV0610)

deprivation is available in the Ohio Court of Claims.  *See Haynes v. Marshall*, 887 F.2d 700, 704 (6th Cir. 1989).  Plaintiff has not alleged that this remedy is inadequate; and he therefore cannot proceed with a claim for denial of procedural due process.

**G.  Eighth Amendment Medical Claims**

Plaintiff alleges that the medical staff at MCI and RiCI have tried to treat him for high blood pressure and mental health issues.  He refused treatment.  He claims they violated his Eighth Amendment rights.

Prison officials may not deprive inmates of "the minimal civilized measure of life's necessities."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Supreme Court in *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), set forth a framework for courts to use when deciding whether certain conditions of confinement constitute cruel and unusual punishment prohibited by the Eighth Amendment.  A plaintiff must first plead facts which, if true, establish that a sufficiently serious deprivation has occurred.  *Id.*  Seriousness is measured in response to "contemporary standards of decency."  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).  Routine discomforts of prison life do not suffice.  *Id.*  Only deliberate indifference to serious medical needs or extreme deprivations regarding the conditions of confinement will implicate the protections of the Eighth Amendment.  *Id.* at 9.  Plaintiff must also establish a subjective element showing the prison officials acted with a sufficiently culpable state of mind.  *Id.*  Deliberate indifference is characterized by obduracy or wantonness, not inadvertence or good faith error.  *Whitley v. Albers*, 475 U.S. 312, 319 (1986).  Liability cannot be predicated solely on negligence.  *Id.*  A prison

(5:12CV0610)

official violates the Eighth Amendment only when both the objective and subjective requirements are met.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

This case is unique in that Plaintiff objects to being offered treatment he believes to be unnecessary.  There is a recognized Eighth Amendment protection for prisoners against "deliberate indifference" to a serious medical need, but that indifference generally involves the failure to provide medical care.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  In cases like this, where the medical personnel are attempting to treat Plaintiff and have made a medical decision about the precise course of treatment for a medical condition, claims are generally unsuccessful.  *See Id.*  This is because subjective requirements needed to state a claim are rarely met under these circumstances.  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008).  Where the prisoner is in the care of a doctor and the allegation is deliberate indifference based on care given and not intentional infliction of pain, the doctor's actions may be considered so subjectively callous as to be constitutionally cruel and unusual only if the care the prisoner received is "grossly inadequate" for the condition.  *Perez v. Oakland County*, 466 F.3d 416, 424 (6th Cir. 2006).  Mere negligence will not suffice and allegations of medical malpractice, negligent diagnosis, or negligent treatment therefore fail to state an Eighth Amendment claim.  *Farmer*, 511 U.S. at 835-36.  Here, Plaintiff disagrees with the diagnosis.  If he is correct in his assertion that his blood pressure is within the normal limits, his allegations would possibly describe an act of medical malpractice or negligent diagnosis.  His allegations, however, do not approach the level of severity needed to show deliberate indifference.

25

(5:12CV0610)

Moreover, Plaintiff names only the wardens of the institutions as defendants.  To satisfy the subjective element of an Eighth Amendment claim, Plaintiff must show that a particular defendant acted with a sufficiently culpable state of mind to deny appropriate medical care.  *Hudson*, 503 U.S. at 8.  There are no allegations in the Complaint (ECF No. 1) suggesting that either Warden Bradshaw or Warden Bunting was aware of Plaintiff's medical condition, the proposed course of treatment or Plaintiff's refusal to accept that treatment.  The wardens cannot be held liable for Eighth Amendment violations unless they were personally engaged in the activities giving rise to the claim.  *Rizzo*, 423 U.S. at 371.

**H.  Legal Mail**

Finally, Plaintiff asserts that officials at MCI opened a letter to Plaintiff from the Department of Justice.  He contends they violated his right to receive legal mail.

Although inmates do retain the right under the First Amendment to receive mail, it is more limited in scope than the constitutional rights held by individuals in society at large.  *Shaw v. Murphy*, 532 U.S. 223, 228-29 (2001).  Some rights, particularly those found in the First Amendment, are simply at times inconsistent with the status of a prisoner.  *Id.* at 229; *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *Procunier v. Martinez*, 416 U.S. 396, 404-405 (1974); *Turner v. Safley*, 482 U.S. 78, 84-85 (1987).  When a prison regulation impinges on a prisoner's constitutional rights, it will be upheld as valid as long as it is reasonably related to legitimate penological interests.  *Turner*, 482 U.S. at 89; *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992).  When making that determination, federal courts must give considerable deference to prison officials.  *Turner*, 482 U.S. at 89.

26

(5:12CV0610)

When considering actions or policies that involve inmate mail, a distinction is drawn between legal mail and non-legal mail. Legal mail is given much greater protection from unreasonable intrusion. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974); *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). Courts have heightened concerns with allowing prison officials unfettered discretion to open and read an inmate's "legal mail," because this correspondence impacts upon the attorney-client privilege, or the prisoner's right of access to the courts. *See Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996). Legal mail, therefore, may be opened and inspected for contraband by prison officials only in the prisoner's presence. *Id.*

Conversely, prison officials may open, inspect for contraband and read a prisoner's incoming non-legal mail provided that the inspection is conducted pursuant to a policy to maintain prison security. *See Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003); *Lavado v. Keohane*, 992 F.2d 601, 607 (6th Cir. 1993). Opening and inspecting of an inmate's non-legal correspondence aids prison authorities in preventing escape plans, inflammatory materials, or other contraband from getting to prisoners. *See Turner*, 482 U.S. at 92; *Young v. Weathersby*, No. 1:09-cv-67, 2010 WL 3909463, at * 8 (W.D. Mich. Sept. 15, 2010). All of those goals directly impact the safety and security of the prison staff and inmates.

Not all mail that a prisoner receives from a legal source, however, is considered to be "legal mail." *Sallier*, 343 F.3d at 874. While mail from a court or the inmate's attorney clearly constitutes "legal mail," mail from other sources, such as a county clerk, do not qualify as constitutionally protected legal mail, absent a specific indication that the contents are "to be

27

(5:12CV0610)

opened only in the presence of the prisoner." *Id.* at 875-78.  Only mail that is considered to be

"legal mail" will received the heightened protection.

There is no indication in the Complaint (ECF No. 1) that the letter from the Department

of Justice was "legal mail."  Plaintiff does not reveal the purpose or the contents of the letter.

Although the Department of Justice is potentially a legal source, it did not come from a court or

from Plaintiff's attorney and Plaintiff does not indicate whether it specifically instructed on the

envelope that it was to be opened only in the presence of the inmate.

Furthermore, even if the letter were considered to be legal mail, Plaintiff has not stated a

claim against these Defendants.  First, an isolated incident of inadvertent mail interference does

not state a claim that rises to the level of constitutional magnitude, and is therefore not actionable

under § 1983.  *See* *Reneer v. Sewell*, 975 F.2d 258, 260 (6th Cir. 1992).  *See also* *Mooney v.*

*Wilson*, No. 6:11-CV-00098-HRW,  2011 WL 4345853, at *1 (E.D. Ky. Sept. 14, 2011); *Searcy*

*v. Culhane*, No. 09-CV-10174, 2009 WL 1864028, at *7 (E.D. Mich. June 29, 2009); *Okoro v.*

*Scibana*, No. 02-1439, 2003 WL 1795860, at *2 (6th Cir. April 1, 2003).  In addition, Plaintiff

has not named a defendant against whom this claim can be asserted.  He does not allege that

Warden Bunting personally opened the letter or that he was involved in any capacity in this

incident.  Absent an allegation connecting him to the alleged violation of Plaintiff's First

Amendment rights, Warden Bunting cannot be held liable for damages.

(5:12CV0610)

## IV.  Conclusion

Accordingly, this action is dismissed pursuant to 28 U.S.C. § 1915(e).  The Court

certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken

in good faith.


IT IS SO ORDERED.


  January 9, 2013                                 /s/ Benita Y. Pearson
Date                                            Benita Y. Pearson
                                                United States District Judge

29